```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       WESTERN DIVISION
```

United States of America,    )
                             )
         Plaintiff,        ) Case No. 1:07-CR-73-002
                             )
   vs.                       )
                             )
Kyron Thomas,                )
                             )
         Defendant.        )

### O R D E R

This matter is before the Court on Defendant Kyron Thomas's motion to suppress (Doc. No. 32). In his motion, Defendant moves for an order suppressing all evidence seized from him on the grounds that the Middletown Police Department searched him in violation of the Fourth Amendment. Defendant also moves for an order suppressing statements made by him on the grounds that they were taken in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). For the reasons that follow, Defendant's motion to suppress is not well-taken and is **DENIED.**

### I. Facts

Sometime during the late morning hours of June 2, 2007, the 911 operator in Middletown, Ohio received the following call about an apparent assault taking place in the parking lot of the Putt-Putt Golf Center:

> Caller: There's a man hitting a woman in the parking lot at Putt-Putt.
>
> 911: There is. Are they black or white?

> Caller: Um. I'm looking for them now.  One of my employees told me they saw 'em and I saw them running around.
>
> 911: Okay.
>
> Caller: Black.
>
> 911: Black.
>
> Caller: They're both black.
>
> 911: Black male.  And she's [sic] hitting a female.
>
> Caller: Uh. Yeah. Black.  They're yelling at each other.
>
> 911: Are they near a car or what?
>
> Caller: They're in the side parking lot of Putt-Putt.
>
> 911: Are they near a car or what?
>
> Caller: Um. No. I was afraid to walk out there to see if they saw me on the phone.

Government's Exhibit 1.[1]  At the request of the 911 operator, the caller gave her name, identified herself as the manager of the Putt-Putt facility, and provided a phone number where she could be contacted.  The operator ended the call by stating that she would dispatch an officer to the scene.

Middletown Police Officer Stephen Winters was the patrolman dispatched in response to the 911 call.  According to Officer Winters, when he arrived at the corner of State Route 122

---

[1] Government's Exhibit 1 is a CD-ROM recording of the actual 911 call.  The transcription of the call, as quoted above, was performed by the Court, after listening to the recording several times, and not by the official court reporter.

and Commerce Drive, an intersection near the location of the reported assault, he saw a green vehicle in the south parking lot of the Putt-Putt facility.  A black female was standing outside of the vehicle between the driver's door and the passenger door.  She was arguing with the driver and the passenger, who were inside in the front of the vehicle.  Doc. 51, at 10-11.  As he watched, the female pulled her arm away from the vehicle and tried to throw her purse or pocketbook at it.  Id. at 11.

   When Winters turned north onto Commerce, the vehicle exited the parking lot and also went north on Commerce.  Winters activated his lights and followed the vehicle for about a quarter of a mile until it pulled into a hotel parking lot.  Winters testified that on the brief drive to the hotel, the vehicle was being driven erratically and the driver ignored several siren blasts to pull over.  The vehicle eventually stopped crossways across several parking spaces.  Winters testified that when he exited his patrol car, he recognized the driver from previous encounters as co-Defendant Brandon Davis.  Winters also said he knew that Davis had a criminal record, albeit unspecified in the current record.  Winters told Davis that he was investigating an assault at the Putt-Putt and Davis responded that it was his cousin and that she was walking back to Cincinnati.  Doc. No. 51, at 12.

As he approached the vehicle, Winters noticed that the passenger, Defendant Kyron Thomas, moving back and forth from his body to the console of the vehicle. Id. at 11. On cross-examination, Winters explained further that the Defendant's head kept rising and falling behind the headrest. Doc. No. 70, at 22. As Winters reached the driver's side window, he could see that the Defendant's hands were coming from the area of the glove compartment. Id. at 22-23. Although Winters did not expressly admit it, a fair reading of his testimony indicates that he did not actually see whether or not the Defendant had in fact placed anything in or had taken anything out of the glove compartment. Doc. No. 70, at 23-24. Winters testified, however, that the Defendant's movements within the vehicle gave him concern that he was concealing something in the glove compartment or on his person. Id. at 25. Winters stated further that the Defendant's activities caused him to fear for his safety and so he waited for a backup officer to arrive before he proceeded any further. Id. When asked whether there was anything in the dispatch call that indicated that drugs or guns might be an issue with this investigation, Winters stated that he knew that the area was known for drug trafficking and that he had served search warrants and made several drug arrests there. Id. at 57. He also said that the dispatch was for an act of violence. Id.

Officer Burch arrived at the scene with Tosia (pronounced "Tosha") Clemons, the victim of the purported assault, in his patrol car.[2] With Burch on the scene, Winters went directly to the passenger side of the vehicle and asked the Defendant to step out. Doc. No. 51, at 12-13. When the Defendant exited the vehicle, Winters told him that he was going to perform a protective pat down. Winters testified that upon performing the pat down, he immediately felt a lump in the Defendant's pants pocket which, without manipulation, he identified as being crack cocaine. Id. Winters based his conclusion that the lump was crack cocaine on his experience of making approximately 500 arrests for crack cocaine violations in his career. Id. Winters handcuffed the Defendant, and then reached in the pocket and removed what turned out to be 2.8 grams of crack. Doc. No. 70, at 38-39. Winters then testified that when he opened the door of the vehicle, he observed several rounds of ammunition on the passenger side floor and console. Doc. No. 51, at 13. Winters placed the Defendant under arrest for possession of crack cocaine. Id. A search of the interior of the vehicle uncovered a .38 caliber Smith & Wesson revolver,

---

[2] Winters testified that he went directly after the vehicle when it left the Putt-Putt parking lot and radioed Burch to stop and pick up Clemons. Clemons, on the other hand, testified that Winters stopped to ask if she was alright, and when she said she was, Winters proceeded after the vehicle.

loaded with five rounds of ammunition, and a .32 caliber revolver of unknown make and model.  Def. Ex. C.

Winters told Clemons that he had retrieved crack from the interior of the vehicle.  Id. at 15.  Clemons then informed Winters that she, Davis, the Defendant, and another person, who turned out be co-Defendant Albert Ward, were all staying in a room at the hotel.  Clemons further told Winters that Ward was the person of interest to the police.  Id. at 16.  According to the police report submitted by the Defendant, Ward gave signed consent for the officers to search the hotel room.  Def. Ex. C. The search of the room discovered approximately 792 grams of crack cocaine.  Id.

The Defendant has also moved to suppress unspecified statements as being given in violation of his Miranda rights. However, Officer Winters testified that he could not recall the Defendant making any statements to him.  Doc. No. 51, at 15. Detective Tim Meehan, who interviewed the Defendant at the police station, testified that he gave the Defendant the Miranda warnings before questioning him.  Doc. No. 69, at 13.  Meehan said that the Defendant indicated that he understood his Miranda rights.  Id.

On June 20, 2007, the grand jury returned a five count indictment which, inter alia, charged the Defendant with conspiracy to possess with intent to distribute in excess of 50

6

grams of cocaine base, in violation of 21 U.S.C. § 846, possession with intent to distribute in excess of 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A), possession with intent to distribute a Schedule II controlled substance, to wit 2.81 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C), and maintaining a place for the distribution of a Schedule II controlled substance, namely in excess of 50 grams of cocaine base, in violation of 21 U.S.C. § 856.

The Defendant now moves to suppress evidence seized by the Middletown Police as being obtained in violation of his Fourth Amendment rights.  The Defendant argues that Officer Winters lacked a reasonable suspicion that a crime was being committed in the first instance when he stopped the vehicle.  The Defendant then argues that Officer Winters lacked a reasonable suspicion that he was armed and dangerous, and therefore, pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), was not permitted to conduct a pat down search or frisk of his outer clothing.  The Defendant next argues that police lacked probable cause to conduct a warrantless search of the vehicle.  The Defendant also argues that Officer Winters violated the Fourth Amendment by seizing the crack cocaine from his pocket.  Finally, the Defendant argues that his Fifth Amendment rights were violated when the officer's obtained statements from him without providing

the Miranda warnings. The Defendant, however, may have abandoned this claim post-hearing because it does not resurface in his reply brief.

## II. Analysis

### A. The Stop of the Vehicle

If the police have a reasonable suspicion that criminal activity is underway, they may detain the suspect for a reasonable time to confirm or dispel their suspicion without the stop ripening into an arrest. United States v. Avery, 137 F.3d 343, 349 (6th Cir. 1997). Whether reasonable suspicion existed for the detention depends on the totality of the circumstances. United States v. Martin, 289 F.3d 392, 397 (6th Cir. 2002). "[T]he totality of the circumstances approach allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. at 398 (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). The Court must give due weight to the factual inferences drawn by local law enforcement officers. Id. (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)). The government bears the burden of establishing that the police had reasonable suspicion to conduct an investigatory stop. United States v. Bueno, 21 F.3d 120, 125 (6th Cir. 1994).

In this case, Officer Winters' stop of the Defendant and Brandon Davis was instigated, at least in part, by the 911 call reporting an assault in progress.  Here, the 911 call is entitled to be accorded a relatively high degree of reliability in the reasonable suspicion analysis.  It was not an anonymous phone call.  Rather, in addition to providing information concerning the apparent assault to the police, the caller also gave her name, stated that she was the manager of the Putt-Putt center, and gave a phone number where she could be contacted. Under similar circumstances, the Sixth Circuit concluded that a known caller should be deemed as reliable as a known informant because a known caller can be subjected to criminal penalties for making a false report.  United States v. Long, 464 F.3d 569, 573-74 (6th Cir. 2006).  In Illinois v. Gates, 462 U.S. 213 (1983), the Supreme Court suggested that information provided by a known person is nearly presumptively reliable in assessing whether the police have probable cause to obtain a search warrant.  Id. at 233-34 ("[[I]f an unquestionably honest citizen comes forward with a report of criminal activity-which if fabricated would subject him to criminal liability-we have found rigorous scrutiny of the basis of his knowledge unnecessary.").  At a minimum, however, the fact that the 911 call in this case was not anonymous contributes largely to finding that Officer Winters had

reasonable suspicion to conduct an investigatory stop of the vehicle.  See Long, 464 F.3d at 573.

Moreover, the information concerning the alleged assault was corroborated to a large degree by Officer Winters' firsthand observations.  The caller said that an assault was taking place in the parking lot of the Putt-Putt center and involved a black man hitting a black woman.  The assault, if indeed there was one, was over by the time Officer Winters arrived at the Putt-Putt facility.  Nevertheless, there was a black woman standing in the parking lot arguing with two black men in a vehicle.  Officer Winters testified that he could hear the argument from his patrol car.  He also testified that he saw Tosia Clemons throw her purse at the vehicle.  Clemons admitted that the argument between her and the Defendant was demonstrative, that she was out of control with her temper, and that other people had probably seen her acting out.  Doc. NO. 71, at 27-29.  Therefore, given all of this activity, which is not inconsistent with at least the aftermath of an assault, Officer Winters clearly had a reasonable basis to investigate further whether an assault had in fact occurred.

The Defendant argues, however, that Winters observed interactions between Clemons and Defendant Davis and that, therefore, there was no basis for Winters to believe that he had assaulted Clemons.  Generally speaking, this in an accurate

10

argument but it does not dispel Officer Winters' reasonable suspicion to proceed with an investigatory stop. Even if Defendant Davis was the only legitimate suspect in the reported assault, the Defendant was riding with Davis in the vehicle and in order to stop Davis, Officer Winters had to stop the Defendant as well. Thereafter, Winters' attention was not directed to the Defendant because he was potentially a suspect in a reported assault, but rather because of his suspicious movements within the interior of the truck.

To recapitulate, Officer Winters had a reasonable suspicion to conduct an investigatory stop of the green vehicle for the reported assault, in which the Defendant was a passenger, based on the 911 call and his observations of the activities in the Putt-Putt parking lot when he arrived. Defendant's brief erroneously focuses only on his conduct leading up to the stop. The fact that the Defendant's individual actions may not have given rise to a reasonable suspicion that he had committed an assault is not material as long as there was a reasonable suspicion to stop Davis. United States v. Perez, 440 F.3d 363, 371-72 (6th Cir. 2006)("[A] moving vehicle may be stopped to investigate an officer's reasonable and articulable suspicion that _its occupants_ had engaged, were engaging, or were about to engage in criminal activity.") (citing United States v. Hensley, 469 U.S. 221, 226-27 (1985) and United States v. Place, 462 U.S.

11

696, 702 (1983)) (emphasis added).  Importantly, the Defendant does not argue that Officer Winters lacked a reasonable suspicion to stop Davis to investigate the reported assault.

Accordingly, Defendant's motion to suppress based on lack of reasonable suspicion for the stop of the vehicle is not well-taken and is **DENIED.**

B. The Frisk of the Defendant and Seizure of the Crack

This is the main issue presented by Defendant's motion - whether Officer Winters had a reasonable suspicion to conduct a Terry frisk of the Defendant.  If the frisk was permissible under Terry, the question becomes whether Officer Winters violated the Fourth Amendment by taking the crack cocaine from the Defendant's pants pockets.

During a Terry stop, a police officer may conduct a limited search for concealed weapons, if the officer believes that a suspect may be dangerous. United States v. Walker, 181 F.3d 774, 778 (6th Cir. 1999)(citing United States v. Strahan, 984 F.2d 155, 158 (6th Cir. 1993)).  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27.  The general test for the allowable scope of law enforcement activity during a Terry stop is whether "the surrounding circumstances give rise to a

12

justifiable fear for personal safety." United States v. Garza, 10 F.3d 1241, 1246 (6th Cir. 1993)(quoting United States v. Hardnett, 804 F.2d 353, 357 (6th Cir. 1986)).

In this case, the principal reason articulated by Officer Winters for believing that the Defendant was dangerous was that he was making furtive gestures in the interior of the vehicle. Specifically, Officer Winters testified that he saw Defendant's head rising up and down behind the headrest and that upon moving closer to the vehicle he saw Defendant's hands returning from the area of the glove compartment. This led Officer Winters to believe, based on his experience, that the Defendant was either retrieving something or trying to conceal something. Doc. No. 70, at 23-24, 52.

"Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions." United States v. Caruthers, 458 F.3d 459, 466 (6th Cir. 2006). The Caruthers Court stated, however, that "courts must take care that [this] factor not be invoked cavalierly" because police officers can subjectively categorize almost any conduct as being suspicious. Id. (quoting in part United States v. Broomfield, 417 F.3d 654, 655 (7th Cir. 2005)(Posner, J.)). Nevertheless, if the conduct at issue is sufficiently objective and particularized, such as bending or leaning accompanied by arm movements or the sound of an item being moved, indicating an

13

attempt to conceal contraband or reach for a weapon, credence will be given to the officer's suspicions.  Id. at 467.  In United States v. Clay, 181 Fed. Appx. 542 (6th Cir. 2006), the Court concluded that the officer had reasonable suspicion to conduct a Terry search of the interior of a car where in part he saw the passengers make furtive movements in the direction of the dashboard.  Id.  In United States v. Graham, 483 F.3d 431 (6th Cir. 2007), the Court held that the officer had reasonable suspicion for a Terry frisk where he saw the defendant dip his right shoulder toward the floorboard of the car, a movement consistent with an attempt to conceal a firearm.  Id. at 439.

In contrast, in Joshua v. Dewitt, 341 F.3d 430 (6th Cir. 2003), a habeas proceeding under 28 U.S.C. § 2254, the Court held that an officer's testimony concerning non-specific furtive gestures was insufficient to establish reasonable suspicion for a Terry search.  Id. at 443.  The Joshua Court observed that "[t]he state trial record does not contain testimony that Petitioner or his companion moved their bodies or arms to conceal anything or to reach for any item."  Id. at 443-44.  Thus, the Court was "unable to discern specific and articulable facts to support the trooper's opinion that Petitioner made furtive gestures."  Id. at 444.

In this case, Officer Winters' testimony that he was concerned that the Defendant was armed and dangerous was

14

supported by specific and articulable facts. As stated, Officer Winters testified that he saw the Defendant's head bob up and down behind the headrest and observed his hands retreating from the area of the glove compartment. As the decisions in Caruthers, Clay, and Graham, have concluded, these kinds of movements or gestures are consistent with attempting to conceal or retrieve a weapon. United States v. Wilson, 506 F.3d 488 (6th Cir. 2007), cited by the Defendant in support of his contention that Officer Winters lacked reasonable suspicion for a Terry search, is distinguishable because in Wilson there was no evidence that the passenger made any of the furtive gestures observed by Officer Winters in this case. Instead, as analyzed by the Wilson Court, the only articulated reasons for frisking the defendant/passenger were the words and actions of the driver, the defendant's extreme nervousness, and the fact that the defendant did not own the car. Id. at 495.

    Defendant argues that his gestures toward the glove compartment could have been innocent, such as to retrieve the vehicle's registration information. While this is true, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." United States v. Arvizu, 534 U.S. 266, 277 (2002). The issue is not whether each factor in isolation is susceptible of an innocent explanation, but rather whether taken as a whole the factors are sufficient to

form a particularized and objective basis for concluding that reasonable suspicion existed.  Id. at 277-78.  As the Court continues to explain further, the totality of the circumstances, including the Defendant's behavior inside the vehicle, established a reasonable suspicion that he was armed and dangerous.

Accordingly, in this case, the Defendant's furtive movements within the interior of the vehicle properly factored into Officer Winter's suspicion that the Defendant was armed and dangerous.

Officer Winters also testified that he was concerned because the area in which he stopped the vehicle was known as high drug trafficking area.  In Caruthers, the Court stated that the officer's awareness that the area is known for crime is relevant in assessing reasonable suspicion, but cautioned that this factor requires careful examination because citing an area as "high crime" could be a proxy for racial, ethnic, or socio-economic profiling.  458 F.3d at 467.  The profiling concerns highlighted by the Caruthers Court are not present in this case, however.  The area where this encounter occurred does not appear to be an inner-city area predominated by any particular racial, ethnic, or socio-economic demographic. Rather, the photographs submitted by the Defendant indicate that the encounter took place in an industrial park-type area, judging from what appears to be

16

an access road and the hotels, businesses, and restaurants depicted in the photos.  See Def. Ex. A.  Additionally, Officer Winters testified without contradiction drug traffickers frequent that area because there are four or five hotels nearby and that he had been involved in several narcotics arrests in that vicinity.  Doc. No. 70, at 57.  Thus, in this case, Officer Winters' awareness that this investigatory stop was taking place in an area known for drug trafficking is an appropriate consideration in determining whether there was reasonable suspicion to frisk the Defendant.  See Caruthers, 458 F.3d at 468 (profiling concerns alleviated where defendant conceded that intersection where he was stopped by police was high crime area).

Finally, although Officer Winters did not observe the Defendant engage in any activity or behavior which per se indicated that he had committed the reported assault, the fact the Officer Winters was investigating an assault in which the Defendant at least fit the general description of the perpetrator was a proper consideration to establish reasonable suspicion for a Terry frisk.  United States v. Cook, No. 98-5457, 1999 WL 357788, at *2 (6th Cir. May 20, 1999).

In summary, under the totality of the circumstances, Officer Winters had a reasonable and articulable suspicion sufficient to justify a Terry frisk of the Defendant.  The Defendant's furtive gestures, consistent with hiding or

17

retrieving a weapon, particularly in the area of the glove compartment, the officer's awareness of the area's reputation for drug trafficking, and the type of crime he was investigating, which involved a report of violence, all gave Officer Winters a reasonable belief that the Defendant might be armed and dangerous.

Having concluded that Officer Winters was justified in frisking the Defendant for weapons, the next issue is whether he was justified in reaching into his pants pockets to retrieve the crack cocaine during the pat down.  In Minnesota v. Dickerson, 508 U.S. 377 (1993), the Supreme Court adopted the "plain feel" doctrine, stated as follows:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by same practical considerations that inhere in the plain-view context.

Id. at 375-76.  In this case, Officer Winters' frisk of the Defendant was justified for the reasons just stated.  Officer Winters further testified that he immediately and without manipulation identified the lump in the Defendant's pocket as crack cocaine based on his experience of over 500 arrests involving crack cocaine.  Doc. No. 51, at 13.  Officer Winters' prior experience with crack cocaine arrests was sufficient to establish probable cause to retrieve the lump from the

Defendant's pocket.  See, e.g., United States v. Whiteside, 22 Fed. Appx. 453, 461 (6th Cir. 2001); United States v. Southard, 20 Fed. Appx. 304, 306 (6th Cir. 2001); United States v. Salvant, No. 96-6167, 1997 WL 152036, at *3 (6th Cir. 1997).  Accordingly, there was no Fourth Amendment violation caused by the warrantless seizure of the crack from the Defendant's pocket.

Once Officer Winters discovered the crack, there was sufficient probable cause to arrest the Defendant for possession of narcotics.  Once the Defendant was under arrest, the police officers were authorized to conduct a warrantless search of the area within his immediate control, Chimel v. California, 395 U.S. 752, 762-63 (1969), as well as the automobile and any containers in which contraband could be hidden.  California v. Acevedo, 500 U.S. 565, 580 (1991).  Thus, in this case, the warrantless search and seizure of the pistols and ammunition from the glove compartment and the floorboard did not violate the Fourth Amendment.

In summary, the record establishes that Officer Winters had a reasonable suspicion to conduct a Terry frisk of the Defendant for weapons and that his seizure of the crack cocaine from his pants pockets was justified under the "plain feel" doctrine.  The warrantless search and seizure of the guns and ammunition from the vehicle was authorized as a search incident to a lawful arrest.

19

Accordingly, for the reasons stated, Defendant's motion to suppress evidence seized at the time of his arrest is not well-taken and is **DENIED.**

### C. Miranda Violations

As stated, Defendant appears to have abandoned his motion to suppress based on Miranda violations.  In any event, the uncontradicted evidence is that the Defendant did not make any statements to Officer Winters that could be suppressed. Detective Meehan testified that he advised the Defendant of his Miranda rights before questioning and that the Defendant indicated that he understood them.  Consequently, the Court finds no Miranda violations on this record.

Accordingly, Defendant's motion to suppress statements given to the police is not well-taken and is **DENIED.**


**IT IS SO ORDERED**


Date February 26, 2008            s/Sandra S. Beckwith
                         Sandra S. Beckwith, Chief Judge
                            United States District Court